UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
────────────────────────────────────────

**LINDA E.,**

                    **Plaintiff,**

v.                                                                      3:19-CV-357 (NAM)

**ANDREW M. SAUL,**
**Commissioner of Social Security,**[1]

                    **Defendant.**
────────────────────────────────────────

**Appearances:**

Jason J. Schibinger, Esq.
Buzgon Davis Law Offices
525 South Eighth Street
Post Office Box 49
Lebanon, PA 17072
*Attorney for the Plaintiff*

Amelia Stewart,
Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
JFK Federal Building, Room 625
Boston, MA 02203
*Attorney for the Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

     Plaintiff Linda E. filed this action on January 8, 2019 under 42 U.S.C. § 405(g), challenging the decision of the Social Security Administration ("SSA") to stop her Title XVI

---

[1] Plaintiff commenced this action against the "Nancy A. Berryhill Acting Social Security Commissioner." (Dkt. No. 1). Andrew M. Saul became the Commissioner on June 17, 2019 and will be substituted as the named defendant in this action. Fed. R. Civ. P. 25(d). The Clerk of Court is respectfully directed to amend the caption.

benefits as of June 30, 2015.  (Dkt. No. 1).  The case was transferred to this Court on March 19, 2019.  (Dkt. No. 6).  The parties have now submitted their briefs regarding Plaintiff's case. (Dkt. Nos. 22, 27).  After carefully reviewing the administrative record, (Dkt. No. 14), the Court reverses the decision of the Commissioner and remands for further proceedings.

**II.  BACKGROUND**

**A.  Procedural History**

On March 3, 2009, Plaintiff was found disabled as of June 1, 2008 due to bipolar disorder and personality disorder.  (R. 180–87).  The Administrative Law Judge ("ALJ") found that the severity of Plaintiff's impairments medically equaled the criteria of Section 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d)).  (R. 186).  In support of this finding, the ALJ noted evidence that Plaintiff was "unable to deal with work-related stress and that she would be expected to decompensate as a result of the stress," and that she had severely impaired abilities in performing activities of daily living and in maintaining concentration and pace.  (R. 186).  The ALJ also stated that medical improvement was expected with continued treatment, and that Plaintiff's case should be reviewed again in the future.  (R. 187).

On June 4, 2015, the field office determined that Plaintiff was no longer disabled as of June 30, 2015.  (R. 188–94).  Plaintiff requested review of that decision, and on November 3, 2017 she appeared for a hearing before ALJ Patrick S. Cutter.  (R. 152–79).

**B.  Plaintiff's Testimony**

At the time of the hearing, Plaintiff was 48 years old.  (R. 155).  Plaintiff testified that she could not work due to pain in her back, hip, feet, and hands, as well as anxiety, bipolar disorder, and panic attacks.  (R. 155–56, 62).  She testified that she has trouble grasping things and has constant pain in her lower back.  (R. 155–56).  For her back pain, Plaintiff said she tried

injections, physical therapy, and medication, but nothing worked. (R. 156–58). Plaintiff said that she was also prescribed an electrical stimulation unit, but her insurance denied coverage. (R. 159). Plaintiff testified that she spends most of the day laying down with pillows between her legs to ease the pain. (R. 161). She said she was "anxious like all the time," and had panic attacks every day. (R. 156, 162). Plaintiff also reported manic symptoms including paranoia, hyperactivity, and trouble sleeping. (R. 164).

### C. Medical Evidence

#### 1. Consultative Exam, Dr. Rafferty

On April 17, 2015, Plaintiff underwent a consultative psychiatric examination with Dr. Karen Rafferty. (R. 469). Plaintiff reported that she was admitted to the hospital in 2005 after she had become "homicidal." (R. 469). She reported that in 2010, she had one to two years of outpatient therapy, but was discharged for failing to keep her appointments. (R. 469). She denied having any current symptoms of depression, or homicidal or suicidal ideation. (R. 470). She reported having anxiety and manic episodes, and problems with sleeping, memory, and concentration. (R. 470). Plaintiff denied any current drug use. (R. 470). Plaintiff reported that she was not able to manage her finances and did not have a valid driver's license. (R. 472).

On examination, Dr. Rafferty noted that some of Plaintiff's behaviors "were erratic and suggestive of being under the influence." (R. 470). Plaintiff demonstrated "adequately developed social skills." (R. 470). Her motor behavior was "extremely restless and hyperactive." (R. 471). Her mood and affect were euthymic. (R. 471). Dr. Rafferty found that Plaintiff's attention and concentration appeared to be slightly impaired. (R. 471). As to her cognitive functioning, Dr. Rafferty found that Plaintiff was in the average range. (R. 471). Plaintiff's insight and judgment were poor. (R. 471).

According to Dr. Rafferty, "the results of the present evaluation appear to be consistent with psychiatric and substance abuse problems, but in and of itself does not appear to be significant enough to interfere with claimant's ability to function on a daily basis." (R. 473). Dr. Rafferty diagnosed Plaintiff with Bipolar disorder type 1 and substance use disorders. (R. 473). Dr. Rafferty recommended that Plaintiff resume psychotherapy and medication management for her symptoms. (R. 473). Dr. Rafferty concluded that Plaintiff's prognosis was poor, given her lack of mental health services. (R. 473).

Dr. Rafferty also completed a Medical Source Statement for Plaintiff dated April 17, 2015. (R. 473–75). Dr. Rafferty found that based on Plaintiff's manic symptoms, she had mild restrictions for understanding, remembering, and carrying out complex instructions and making complex work-related decisions, as well as moderate limitations for interacting with the public, supervisors, and co-workers. (R. 473–74).

### 2. State Agency Psychologist, Dr. Fretz

Roger Fretz, Ph.D., reviewed Plaintiff's medical records and found on April 22, 2015 that Plaintiff demonstrated bipolar disorder, but no severe impairments. (R. 478, 481). Dr. Fretz found that any limitations for Plaintiff were mild. (R. 488). Dr. Fretz also noted that Plaintiff was not participating in treatment, and during her consultative examination, she was cooperative and manifested no evidence of a thought disorder or severe dysfunction in any area; Dr. Fretz also noted that Plaintiff was able to engage socially and did not manifest any difficulty in the attentional domain. (R. 489–90). Dr. Fretz thus found that Plaintiff's condition had demonstrated medical improvement. (R. 490). Another consultant, Richard W. Williams, Ph.D., reviewed Plaintiff's file and agreed with Dr. Fretz's assessment. (R. 513).

### 3. Psychiatric Evaluation, Dr. Felicia DeJesus

On August 4, 2015, Plaintiff visited Dr. DeJesus for a psychiatric evaluation. (R. 618). Plaintiff reported a history of bipolar disorder and anxiety, for which she was not currently on medication. (R. 618). She reported chronic insomnia, some paranoid ideations, and anxiety. (R. 618). She reported having taken psychotropic medications in the past. (R. 618). Dr. DeJesus found that Plaintiff's affect was anxious and slight dysphoric at times. (R. 619). Her cognition and memory were fair. (R. 619). As to mental conditions, Dr. DeJesus diagnosed Plaintiff with bipolar and anxiety disorders. (R. 619). Among other things, Plaintiff was prescribed psychotropic medication and encouraged to participate in counseling sessions. (R. 620).

### 4. Mental Health Treatment Records

Plaintiff also saw Dr. DeJesus and other medical providers at T.W. Ponessa & Associates for counseling services and medication management. On September 21, 2015, Dr. DeJesus found that Plaintiff's thought process was coherent and concrete and that she demonstrated no delusional thoughts. (R. 440). Plaintiff denied any psychotic symptoms but had some paranoid ideation. (R. 440). Dr. DeJesus found that her cognition and memory were fair, and her judgment and insight were fair to somewhat limited. (R. 440). Plaintiff's bipolar and anxiety diagnoses remained the same and she was prescribed medication to address paranoia and mood symptoms. (R. 441).

Plaintiff returned on October 19, 2015 and reported adherence with current medication and ongoing benefit. (R. 437). Plaintiff's thought process was coherent, concrete, and she demonstrated no signs of delusions or paranoid thinking. (R. 437). Her cognition and memory were fair to good, and her judgment and insight were fair. (R. 437). Plaintiff was advised to continue her medication regimen and outpatient therapy. (R. 438).

On December 21, 2015, March 15, 2016, and June 6, 2016, Plaintiff's status and treatment remained largely the same. (R. 88, 433–36). On August 8, 2016, Plaintiff reported that her anxiety had been aggravated lately and she had difficulty with concentration. (R. 85). She denied any psychotic symptoms that affected her functioning. (R. 85). Her thought process was concrete and coherent, cognition and memory fair to good, and judgment and insight fair. (R. 85). Plaintiff remained on medications for mood, anxiety, and insomnia. (R. 86). On August 22, 2016, Plaintiff reported that the medications were having minimal effect on her mood and that she was compulsively cleaning. (R. 83). Anxiety was noted, but Plaintiff's status remained largely the same; her medications were adjusted. (R. 83). On September 6, 2016, Plaintiff reported that her mood was "great," her anxiety was under control, and she was compliant with medications. (R. 81). Her affect was noted to be euthymic and restless; otherwise her status remained the same. (R. 81).

On October 4, 2016, Plaintiff's mood was "okay," and her anxiety was well controlled. (R. 79). Plaintiff's affect was less restless than before; otherwise her status remained the same. (R. 79). On March 30, 2017 and April 27, 2017, Plaintiff reported a "good" mood, and that her medication had been helpful with her mood symptoms; otherwise her status remained the same. (R. 77, 75). On July 6, 2017, Plaintiff reported that she had not had medications in two months and had difficulty getting a doctor's appointment. (R. 73). She reported that while not being on medication, she experienced manic symptoms of not wanting to go to sleep, increased energy, yelling, and feeling irritable. (R. 73). Plaintiff was restarted on her medications. (R. 73).

On July 20, 2017, Plaintiff reported that she had just begun her new medications and was unable to assess if her mood symptoms had improved yet. (R. 70–71). On September 25, 2017, Plaintiff was discharged from outpatient therapy and medication management due to non-

6

compliance. (R. 60). Plaintiff's outpatient therapist noted that Plaintiff's progress in therapy was limited due to resistance to therapeutic interventions and poor attendance. (R. 60)

### 5. Orthopedic Examination, Dr. Boatwright

On May 1, 2015, Plaintiff underwent an orthopedic examination with Dr. Roger Boatwright. (R. 492). Plaintiff reported low back pain and pain at the base of both thumbs. (R. 492). On examination, Dr. Boatwright found that Plaintiff was in no acute distress; her gait and squat were normal, she demonstrated intact dexterity of the hands and fingers, 4/5 grip strength bilaterally, and she retained the ability to zip, button, and tie clothing items. (R. 493).

Dr. Boatwright found no cervical or paracervical pain or spasm, no evident joint deformity, no muscle atrophy, no sensory abnormality, and 5/5 strength in proximal and distal muscles bilaterally. (R. 493). Dr. Boatwright noted spinal and paraspinal tenderness along L3 and LF and the left SI joint; otherwise nontender with no spasm. (R. 493). He diagnosed Plaintiff with low back pain and osteoarthritis in both thumbs, with a fair prognosis. (R. 494).

Dr. Boatwright also reviewed medical imaging for Plaintiff: an X-ray of her right hand was normal, and a Lumbosacral Spine X-ray showed mild degenerative spondylosis at L3-L4, and overall degenerative changes. (R. 496–97).

Dr. Boatwright provided the following functional assessment: Plaintiff could frequently lift up to 10lbs, occasionally lift 11–20lbs, and never lift more than that; Plaintiff could frequently carry up to 10lbs but never more than that; Plaintiff could sit one hour at a time without interruption, and stand/walk 20 minutes without interruption; Plaintiff could sit a total of 4 hours in an 8-hour workday, with 2 hours standing and 2 hours walking; Plaintiff could frequently reach, handle, finger, feel, push, and pull; and Plaintiff could occasionally balance, stoop, kneel, and crouch, but never crawl or climb ladders/scaffolds. (R. 498–501).

### 6. State Agency Physician, Dr. Balogh

Plaintiff's medical records were also reviewed by Dr. Robert J. Balogh, Jr., who noted "no records for treatment of the hand and foot arthritis or back pain." (R. 510). Dr. Balogh stated that Plaintiff's consultative exam showed that she was "functionally normal," and her X-rays were unremarkable. (R. 510). Therefore, Dr. Balogh concluded that "[t]his is a minimal impairment." (R. 510). Another consultant, Dr. Carl Ritner, reviewed Plaintiff's file and agreed with Dr. Balogh's assessment. (R. 514).

### 7. Physical Treatment Records

Plaintiff attended several sessions of physical therapy for her back pain, starting in May 2015. She reported that due to back pain she had difficulty sleeping, lifting, bending, and climbing stairs. (R. 553). She canceled a session on May 12, 2015 due to an "altercation" which forced her to move. (R. 557). She started physical therapy again in September 2015. (R. 532). She reported constant lower back pain which interfered with sleeping, reaching, lifting, and prolonged sitting. (R. 532). On evaluation, her therapist noted moderate to high levels of pain in right shoulder and lower back, and "partial dysfunction," which limited overhead reaching and pushing/pulling with her right upper extremity. (R. 533). Plaintiff returned for three more sessions and continued to report pain. (R. 537–40). Plaintiff missed several sessions thereafter and was discharged for poor attendance. (R. 546).

In 2017, Plaintiff also sought treatment at the Lebanon Pain Relief Center. (R. 36). She reported persistent lower back pain, rated 9 out of 10 in severity. (R. 36). Plaintiff was noted to be taking Tramadol medication for the pain and referred for possible injections. (R. 36). On April 14, 2017, Plaintiff underwent Sacroiliac Joint injection. (R. 41). On May 1, 2017, she underwent a Medial Branch block injection. (R. 48). She returned on June 19, 2017 and

reported continued lower back pain. (R. 54). She was advised about repeating the injections and using an electrical stimulation unit. (R. 56–57).

### D. ALJ Decision

ALJ Cutter utilized the seven-step process for evaluating whether Plaintiff's disability had ended. (R. 16–24). At step one, the ALJ found that since June 30, 2015, Plaintiff had the following medically determinable impairments: anxiety disorder, bipolar disorder, chronic obstructive pulmonary disease ("COPD"), lumbar degenerative disc disease, and osteoarthritis of the hands and feet. (R. 18). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925, 416.926). (R. 18). As to Plaintiff's mental impairments, the ALJ found that Plaintiff had: no limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; and mild limitation in concentrating, persisting, or maintaining pace. (R. 18). Thus, the ALJ found that Plaintiff's mental impairments did not cause at least one "extreme" limitation or two "marked" limitations to meet a Listing. (R. 18). The ALJ also found that the record did not establish that Plaintiff had only marginal adjustment, "that is, a minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." (R. 18).

At step two, the ALJ found that medical improvement occurred on June 30, 2015, stating that "the record shows that the claimant's psychiatric symptoms have improved significantly since the date of the comparison point decision, and have been stable on prescribed medications (per claimant reporting and clinical observation). The claimant's treatment records have noted little consistent functional deficiency." (R. 19).

At step three, the ALJ found that Plaintiff's medical improvement is related to the ability to work because, by June 30, 2015, the impairments found in her prior disability decision from March 3, 2009 no longer met the same Listing. (R. 19). The ALJ stated that this conclusion "is supported by the claimant's treatment history, clinical mental status examinations and the opinions of the examining and reviewing medical sources." (R. 19).

At step five (step four does not apply in this case), the ALJ found that Plaintiff continued to have a severe impairment or combination of impairments related to anxiety and bipolar disorder because they caused more than minimal limitation in Plaintiff's ability to perform basic work activities. (R. 19). The ALJ assessed that Plaintiff's non-severe conditions related to COPD, lumbar degenerative disc disease, and osteoarthritis. (R. 19).

At step six, the ALJ found that, based on Plaintiff's current impairments, she had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can perform work involving no more than frequent non-confrontational interaction with supervisors, coworkers or the general public." (R. 19). In formulating this RFC, the ALJ summarized Plaintiff's medical records and found that they showed "only limited and conservative treatment," and that Plaintiff's psychiatric symptoms had "improved significantly." (R. 22). The ALJ noted that Plaintiff's treatment records showed "little consistent and significant functional deficiency." (R. 22). Further, the ALJ found that Plaintiff's records did not "consistently document any more than minimal functional limitation over the course of the period at issue," and that Plaintiff's allegations of physical limitation were not supported by her treatment history or exam findings. (R. 22).

As to the opinion evidence, the ALJ gave "substantial weight" to the opinions of Drs. Rafferty, Fretz, and Williams regarding Plaintiff's mental functioning, "which were well-

supported by the evidence of record as of the dates of their examination and review." (R. 22). As to Plaintiff's physical functioning, the ALJ gave "significant weight to the opinions of State agency reviewing physicians Dr. Balogh and Dr. Ritner," which "were supported by the claimant's minimal treatment and demonstrated examination performance as of the dates of their review." (R. 22). The ALJ gave "limited weight" to Dr. Boatwright's opinion that Plaintiff was limited to light work, which "was based largely on the [her] subjectively alleged discomfort, and is not fully consistent with his own documented examination findings on the date of evaluation or the claimant's longitudinal examination reports (and lack of significant treatment) since June 2015." (R. 22)

At step seven, the ALJ found that since June 30, 2015, "considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant has been able to perform a significant number of jobs in the national economy." (R. 23). The ALJ asked a vocational expert at Plaintiff's hearing whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC since June 30, 2015. (R. 23). The vocational expert testified that someone in Plaintiff's position would be able to perform the requirements of representative occupations including commercial cleaner, day worker, and housekeeping cleaner. (R. 23–24). Based on this testimony, the ALJ found that since June 30, 2015, Plaintiff had been able to make a successful adjustment to work that existed in significant numbers in the national economy. (R. 24). Therefore, the ALJ concluded that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social Security Act. (R. 24).

Plaintiff requested review of the ALJ's decision by the Appeals Council but was denied. (R. 1). Plaintiff then commenced this action. (Dkt. No. 1).

### III.   DISCUSSION

#### A. Disability Standard

To be considered disabled, a claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Once a person is found disabled, the SSA follows a seven-step process in deciding whether the disability continues or has ended:

1) Do you have an impairment or combination of impairments which meets or equals the severity of [a listed impairment]? If you do, your disability will be found to continue.

2) If you do not, has there been medical improvement (which is defined as any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled) (*see* 20 C.F.R. § 416.994(b)(1)(i)).

3) If there has been medical improvement, we must determine whether it is related to your ability to do work . . . *i.e.*, whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination.

4) If we found at step 2 . . . that there has been no medical improvement or if we found at step 3 . . . that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (b)(3) and (b)(4) of this section apply . . .

> 5) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe . . .
>
> 6) If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960 . . .
>
> 7) If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment . . . and your age, education, and past work experience.  If you can, we will find that your disability has ended.  If you cannot, we will find that your disability continues.

20 C.F.R. § 416.994(b)(5).  The Regulations define residual functional capacity ("RFC") as "the most you can still do despite your limitations," including limitations on physical and mental abilities.  20 C.F.R. §§ 404.1545, 416.945.  In assessing the RFC of a claimant with multiple impairments, the Commissioner considers all "medically determinable impairments, including . . . medically determinable impairments that are not 'severe.'"  *Id*. at §§ 404.1545(a)(2), 416.945(a)(2).

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled.  Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  The Court may set aside the final decision of

the Commissioner only if it is not supported by substantial evidence or if it is affected by legal error.  42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

### C. Analysis

Plaintiff challenges the ALJ's decision on several grounds: 1) the ALJ failed "to properly consider Plaintiff's limitations from her anxiety disorder and bipolar disorder, when considering whether Plaintiff's medical and psychological condition has improved to the extent that she is no longer disabled"; 2) the ALJ failed "to consider the limitations from Plaintiff's COPD, lumbar degenerative disc disease and osteoarthritis of the hand and feet, when considering Plaintiff's limitations regarding her residual functional capacity"; 3) the ALJ failed "to consider any exertional limitations in setting forth Plaintiff's residual functional capacity"; and 4) the RFC determined by the ALJ selectively relied on the opinion of the Consultative Exam Physician and "only considered some of the limitations in the report, and not others, which would have had an impact on Plaintiff's residual functional capacity."  (Dkt. No. 22).

In sum, Plaintiff claims that the RFC formulated by the ALJ is not supported by substantial evidence for either the mental or physical aspects.  The Commissioner disagrees.

### 1. Mental Limitations

Plaintiff argues that the RFC failed to account for her mental limitations, including "the need for unscheduled breaks to deal with panic attacks, her ability to remain on task due to paranoia, racing thoughts, and inability to focus, and her ability to attend work on a regular and sustained basis, due to her ongoing issues with her mental-health related disorders."  (Dkt. No.

22, p. 14). In response, the Commissioner argues that "substantial evidence supports the ALJ's finding that Plaintiff experienced medical improvement in her mental impairments as of June 30, 2015." (Dkt. No. 27, p. 5).

Upon review of the record, the Court finds that the mental aspect of the RFC is not supported by substantial evidence. Notably, there is no assessment of whether Plaintiff would be off-task, need breaks, or miss work due to her mental health symptoms, which include anxiety, panic attacks, paranoia, and mania. While Plaintiff was found to have fair to average cognition, there is no assessment of whether she could sustain that functionality during full-time employment.

According to the Regulations, the RFC must "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." SSR 96-8P. Among those functions are mental abilities:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(c), 416.945(c). In addition, the mental RFC assessment process requires "a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." SSR 96-8P. Here, the ALJ recognized that Plaintiff has severe mental health impairments for anxiety and bipolar disorder and summarizes her medical record. But aside from limiting Plaintiff to "no more than frequent non-

confrontational interaction with supervisors, coworkers or the general public," the RFC does not identify the impact of Plaintiff's impairments with a detailed function-by-function assessment.

Although the ALJ gave substantial weight to the opinion of Dr. Rafferty, the RFC does not clearly account for Dr. Rafferty's finding that Plaintiff's insight, judgment, and prognosis were poor, (R. 471, 473), which is consistent with the findings in her prior disability decision, (R. 186). Further, the RFC appears to rely on the ALJ's finding that Plaintiff had "consistent stability on prescribed medication," but the record shows frequent changes in medication and inconsistent compliance. For example, Plaintiff stated that she stopped taking her medications in 2012 and resumed in 2015. (R. 441). She stopped taking her medication again in 2017. (R. 73). Thus, it is not clear whether Plaintiff's condition is stable, which raises questions as to her ability to function "on a sustained basis." *See* 20 C.F.R. § 404.1520a(c)(2). Indeed, Plaintiff's documented poor judgment and insight as to her condition pose significant problems for compliance and stability.[2] But there is no indication the ALJ considered whether Plaintiff's inconsistent compliance with medications undermined her RFC.

Based on the forgoing, the Court finds that remand is necessary for reconsideration of the medical evidence regarding Plaintiff's mental limitations and whether they impact her RFC. *See Tricic v. Astrue*, No. 07-CV-9997, 2010 WL 3338697, at *6, 2010 U.S. Dist. LEXIS 87592, at *18 (N.D.N.Y. Aug. 24, 2010) (remanding for reconsideration of evidence regarding the plaintiff's mental limitations and their effect on his RFC where, among other things, the ALJ made no reference to a doctor's opinion that the plaintiff's insight and judgment were poor).

### 2. Physical Limitations

---

[2] Courts have recognized that it is common for bipolar patients to cycle through periods of non-compliance due to the nature of their symptoms. *See Frankhauser v. Barnhart*, 403 F. Supp. 2d 261, 278 (W.D.N.Y. 2005).

Next, Plaintiff argues that the RFC failed to account for her physical limitations, "despite clear evidence and testimony that she suffers from multiple physical impairments affecting her hand, feet, neck, back, arms, hips and legs." (Dkt. No. 22, p. 19). The Commissioner suggests that substantial evidence supports the ALJ's physical RFC finding. (Dkt. No. 27, p. 7). The ALJ found that Plaintiff could perform "the full range of work at all exertional levels," with only non-exertional limitations. (R. 19).

Upon review of the record, the Court finds that the physical aspect of the RFC is not supported by substantial evidence. Notably, Dr. Boatwright was the only doctor who examined Plaintiff's physical abilities, and he found that she could not lift more than 20lbs or carry more than 10lbs. (R. 498–501). Although the ALJ found no restrictions, Dr. Boatwright's assessment ruled out anything more than light work. *See* 20 C.F.R. § 404.1567. The ALJ gave "limited weight" to Dr. Boatwright's opinion because it "was based largely on the [her] subjectively alleged discomfort, and is not fully consistent with his own documented examination findings on the date of evaluation or the claimant's longitudinal examination reports (and lack of significant treatment) since June 2015. (R. 22). The ALJ then gave significant weight to the opinions of Dr. Balogh and Dr. Ritner, even though they did not examine Plaintiff. Thus, the RFC appears to reject Dr. Boatwright's functional assessment while relying on Drs. Balogh and Ritner. However, the latter two opinions are scant and do not amount to substantial evidence because they fail to draw a clear connection to the medical record.

Further, the ALJ's decision to discount Dr. Boatwright's opinion and Plaintiff's symptoms based on her purported "lack of significant treatment history" is not supported by the record. Plaintiff's records show that she treated her back pain with injections, physical therapy, gel, and medication, which is consistent with her testimony. (R. 100–08, 56–58). For example,

17

Plaintiff underwent a Sacroiliac Joint injection on April 14, 2017. (R. 41). On May 1, 2017, she underwent a Medial Branch block injection. (R. 48). The record also contains numerous references to Plaintiff taking medication to treat her pain, most notably the narcotic Tramadol.[3] (*See* R. 36, 605). Despite these measures, she continued to report "moderate-severe" back pain. (R. 54). Plaintiff was also prescribed an electrical stimulation unit, but her insurance denied coverage. (R. 158–59). The ALJ's decision does not mention any of these specific treatments. Nor did the decision address whether Plaintiff's mental health symptoms affected her ability to consistently attend physical therapy. Overall, the record demonstrates that Plaintiff repeatedly tried without success to treat her back pain. Therefore, the negative inference drawn by the ALJ is not supported by substantial evidence. *See Rivera v. Berryhill*, No. 16-CV-05021, 2018 WL 388942, at *6, 2018 U.S. Dist. LEXIS 5977, at *18 (E.D.N.Y. Jan. 12, 2018) ("The Court finds that the ALJ erred in discounting Plaintiff's pain statements. First, the ALJ's determination that Plaintiff's treatment regime for her pain was 'conservative' is directly contradicted by Plaintiff's medical records, which show that Plaintiff has consistently been taking powerful pain killers and receiving epidural steroid injections for her pain since November 2009. . . . Thus, the ALJ's rationale for judging Plaintiff's treatment regime as 'conservative' relative to her claimed pain symptoms is not discernable from the Decision and, therefore, cannot be said to be supported by substantial evidence.").

### 3. Remand

In sum, although the ALJ's decision cites substantial evidence in finding that Plaintiff's mental impairments no longer met a Listing as of June 30, 2015, the RFC is not supported by

---

[3] The Tramadol was apparently prescribed by Dr. Francis Gallagher. (*See* R. 101). The record does not contain a detailed functional assessment by Dr. Gallagher, even though he saw Plaintiff numerous times during the relevant time period.

substantial evidence because it did not adequately assess the functional limitations imposed by Plaintiff's mental and physical conditions.  The Court finds that remand is necessary for the ALJ to properly determine Plaintiff's RFC based on all of the record evidence.  As part of that process, the ALJ should specifically explain how the medical evidence relating to Plaintiff's limitations translates into the RFC.

## IV. CONCLUSION

For the foregoing reasons it is

**ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Memorandum-Decision and Order to the parties in accord with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   April 15, 2020
        Syracuse, New York

*[signature]*
Norman A. Mordue
Senior U.S. District Judge